# United States Court of Appeals
## For the First Circuit

No. 23-1914

ORLANDO GONZÁLEZ TOMASINI,

Plaintiff, Appellant,

JULIETTE IRIZARRY-MIRANDA; CONJUGAL PARTNERSHIP
GONZÁLEZ-IRIZARRY; K O G, Minor; V D R, Minor; S G I, Minor;
M A R, Minor,

Plaintiffs,

v.

LOUIS DEJOY, Postmaster; UNITED STATES POSTAL SERVICE,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Marcos E. López, U.S. Magistrate Judge]

---

Before

Aframe, Hamilton[*], and Thompson,
Circuit Judges.

---

Carlos M. Sánchez La Costa, with whom Sanchez La Costa Law Firm, was on brief, for appellant.

Dennise N. Longo Quiñones, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

---

[*] Of the Seventh Circuit, sitting by designation.

February 2, 2026

**AFRAME, <u>Circuit Judge</u>**.  "No fraud is more odious than an attempt to subvert the administration of justice."  <u>Hazel-Atlas Glass Co.</u> v. <u>Hartford-Empire Co.</u>, 322 U.S. 238, 251 (1944) (Roberts, J., concurring).  That is the kind of fraud we confront here.  On the eve of trial in an employment case brought against the United States Postal Service and Postmaster General David Steiner[1] (collectively, the "Postal Service"), the Postal Service accused plaintiff Orlando González Tomasini of witness tampering.  The district court held a three-day evidentiary hearing before ruling that González had indeed tampered with a witness and that dismissing his case was the appropriate sanction.  González now appeals the decision to hold the hearing, the tampering finding, and the selected sanction.  We affirm in all respects.

**I.**

González challenges first the district court's decision to hold an evidentiary hearing.  We review that decision for abuse of discretion.  <u>See</u> <u>Teti</u> v. <u>Bender</u>, 507 F.3d 50, 60 (1st Cir. 2007).  To set the stage, we describe the relevant procedural background.

In April 2017, González and his then-wife, Juliette Irizarry-Miranda, sued the Postal Service, González's employer, alleging various civil rights and torts claims.  As part of the

---

[1]    As this appeal progressed, Louis DeJoy became U.S. Postmaster General and was substituted for his predecessors.

complaint, González alleged that he has been unable to work because of various psychological and medical conditions. After initiating divorce proceedings, González filed an amended complaint listing himself as the sole plaintiff. The presiding district judge then referred the case, with the parties' consent, to a magistrate judge, who, after resolving various pretrial motions, dismissed several claims and set the trial for July 26, 2022. See 28 U.S.C. § 636(c) (permitting such referrals).

A week before the scheduled trial, the parties attended a pretrial conference, during which counsel for the Postal Service announced that Irizarry would testify for the defense. The next day, the Postal Service filed a motion requesting an evidentiary hearing to determine whether González had tampered with Irizarry as a potential witness.

The Postal Service alleged that González and Irizarry were involved in an ongoing custody dispute regarding their minor son. It further claimed that, shortly after the pretrial conference, González called Irizarry and sought to dissuade her from testifying at the upcoming trial by conditioning his concession to her custody demands on her refusal to testify. Irizarry recorded part of the call, and the Postal Service submitted that recording to support its motion.

González opposed the request for an evidentiary hearing. He contended that Irizarry called him first; the recording violated

- 4 -

Puerto Rico law; Irizarry was not credible; and González was merely asking questions, not intimidating Irizarry. The district court granted the Postal Service's motion and held a three-day evidentiary hearing, after which it concluded that González had engaged in witness tampering and dismissed the case.

On appeal, González contends that the district court should have declined to hold a hearing because the Postal Service's motion was deficient. His central argument is that the Postal Service made "material misrepresentations" that: (1) González called Irizarry first; (2) González sought guarantees from Irizarry that she would not testify; and (3) the two discussed "sophisticated concepts" for defeating the requirement that Irizarry testify.

As an initial matter, González cites no authority supporting his argument that the district court abused its discretion by deciding to hold an evidentiary hearing. Nor can we find any, likely because the typical appellate claim about an evidentiary hearing is a party's assertion that the trial court abused its discretion by <u>declining</u> to hold such a hearing. Indeed, we have some trouble envisioning when holding a hearing -- even if not required -- would constitute reversible error.

In civil cases, "[w]hen a motion relies on facts outside the record, the court . . . may hear it wholly or partly on oral testimony . . . ." Fed. R. Civ. P. 43(c). Such an evidentiary

- 5 -

hearing is "highly desirable" when issues of fact are disputed. Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988) (Aoude I). Where "the question is close and time permits . . . doubt should be resolved in favor of taking evidence." Id. at 894.[2]

Here, the Postal Service presented a motion that made serious accusations against González. González contested those allegations, asserting that the Postal Service made material misrepresentations. In challenging the facts described in the Postal Service's motion, González created the kind of dispute that best will resolve through an evidentiary hearing, i.e., a dispute about what happened. Accordingly, the district court appropriately decided that the information before it "present[ed] a controversy which reaches the threshold to require that the court hold an evidentiary hearing."

---

[2] González claims that an evidentiary hearing is warranted only if the moving party establishes that witness tampering occurred by clear and convincing evidence. In doing so, he erroneously conflates the standard for proving sanctionable conduct with the showing required to merit an evidentiary hearing. Compare Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (Aoude II) (noting that fraud on the court must be demonstrated by clear and convincing evidence), with United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011) (requiring an evidentiary hearing "if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." (internal quotation marks omitted) (quoting United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996))).

Our conclusion is buttressed by the reality that the "the trial judge is steeped in the facts and has a superior vantage point for assessing motions of this sort." United States v. McAndrews, 12 F.3d 273, 279-80 (1st Cir. 1993); cf. Fernandez v. Leonard, 963 F.2d 459, 463 (1st Cir. 1992) (affirming decision not to hold evidentiary hearing and make pre-trial finding of fraud on the court). The district court faced conflicting assertions from the parties and carefully resolved them by gathering evidence and hearing argument. A court cannot be faulted for that.[3]

## II.

González next challenges the district court's finding that there was clear and convincing evidence of his having engaged in witness tampering. We must accept a trial court's findings of fact unless they are clearly erroneous, and we "must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6); see Amadeo v. Zant, 486 U.S. 214, 223 (1988). Clear error occurs when the reviewing court

---

[3] In further support of his claim against the decision to hold the evidentiary hearing, González also asserts that the recording was insufficient to establish that he had the requisite knowledge to commit witness tampering. In doing so, he refers to the federal criminal statute governing witness intimidation, 18 U.S.C. § 1512. Yet the salient issue is whether González committed a fraud on the court, not whether he engaged in criminal witness intimidation under § 1512. Moreover, even if we adopted González's premise that the recording itself was insufficient evidence of knowledge, holding an evidentiary hearing to better air the issues was not an abuse of discretion for the reasons discussed.

"is left with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 394-95 (1948)). Under the clear error standard, we may not reverse a district court's factual conclusion if its "account of the evidence is plausible in light of the record viewed in its entirety," even if we may "have weighed the evidence differently." Id. at 574. Thus, we turn to whether the court breached this standard in finding that González engaged in witness tampering by clear and convincing evidence.

During the three-day evidentiary hearing, the district court heard testimony from González, Irizarry, and a social worker named Angélica Alvira-Velázquez. Presented in the light most favorable to the court's finding, the evidence is as follows. See Supermercados Econo, Inc. v. Integrand Assurance Co., 375 F.3d 1, 4 (1st Cir. 2004).

González and Irizarry married in October 2012 and began living together with their children from prior relationships. González and Irizarry had a son together a few years later, in April 2015. At the time, González worked for the Postal Service.

However, González was arrested in October 2015 for various federal offenses, including witness tampering in violation of 18 U.S.C. § 1512(b)(1). González was ultimately acquitted about a year later. González stopped working for the Postal Service

upon his arrest, and once he was acquitted, Irizarry overheard him tell his brother that "he was not going to resume working, [and] that he was going to open a case . . . ." After overhearing this conversation, Irizarry stopped believing González's allegations about his unfair treatment by the Postal Service. The following spring, González commenced this action against the Postal Service.

Meanwhile, Irizarry worked in the insurance industry. In 2013, she consented to a fine imposed by the Office of the Insurance Commissioner for filing insurance documents that contained false information.

After Hurricane Maria struck Puerto Rico in September 2017, Irizarry moved to Miami, Florida, with her children. In April 2018, González visited Miami to watch Irizarry's children while she traveled to Puerto Rico to take care of her affairs. While in Puerto Rico, at the marital home she had shared with González, Irizarry found a bag with bottles of medications prescribed to him, many of which were full or unopened. She took photos of the pills, some of which had been prescribed to treat depression. After finding the unused medication, Irizarry concluded that González had been lying about the medical conditions that he claimed were brought on from his mistreatment by the Postal Service.

González testified that, when Irizarry returned to Miami on April 22, 2018, he told her that her daughter was "selling drugs

and having sex with a friend." According to González, Irizarry became upset and did not want to believe him. However, Irizarry testified instead that, upon her return, her daughter confided in her that González had been sexually abusing her since she was twelve years old. Irizarry called 911 to report the allegation and obtained a protective order against González in Florida. In May 2019, Irizarry's daughter also filed an incident report with the Puerto Rico police alleging that González had sexually abused her.

González returned to Puerto Rico but could not contact his son because of the protective order. After going months without contacting his son, González filed for divorce from Irizarry in August 2018. The divorce was finalized in January 2019. While the divorce proceeding remained pending, on August 18, 2018, Irizarry moved to Virginia. Once there, Irizarry obtained another protective order against González for their shared son, her daughter, and herself.

Following the divorce, González filed for sole custody of his son, claiming that Irizarry neglected him. Irizarry also sought sole custody. By the time of the July 2022 evidentiary hearing in this case, the two had reached a temporary child custody agreement in which their son lived with Irizarry and González participated in daily video calls with him through a tablet application. The custody agreement mandated that González and

Irizarry communicate via WhatsApp so that the Puerto Rico family court could request copies of the communications between them. When the evidentiary hearing occurred, both González and Irizarry were still seeking sole custody.

In August 2020, the Postal Service announced that it would seek to depose Irizarry in González's case. González filed several motions to bar her testimony, but the Postal Service nonetheless deposed her in March 2021. González appeared at the deposition by video and heard Irizarry testify that he had faked his injuries.

Social worker Alvira was assigned to González and Irrizary's custody case in May 2021. She noted that initially their relationship "was conflictive and of little communication." On June 22, 2021, Alvira interviewed Irizarry, who stated that González had "manipulated her, and [that] she was afraid."

Less than a year later, on April 22, 2022, González visited Irizarry and their son in Virginia. He says that he hoped to reconcile with Irizarry and wanted to talk about reaching an agreement in their custody case. Irizarry was amenable to compromising on custody because her "greatest fear [was] to have [her] child taken away from [her]." She feared losing custody because González had previously "t[aken] his [older son] away from his mother."

- 11 -

On May 24, 2022, Irizarry told Alvira that she wanted to reach a joint custody agreement but believed that resolution of the custody case would depend on González.[4] She also told Alvira that she was not going to testify in González's case against the Postal Service and that she was dropping a complaint against González for sexually abusing her daughter, noting that the decision to end the investigation would greatly affect her custody case.

Irizarry testified that between May 22 and July 19, 2022, González told her "over six times" that he did not want her to testify in his case against the Postal Service. For example, on May 26, 2022, González told Irizarry via a WhatsApp message that "there are obstacles that prevent reaching some agreement and it is up to you to solve them . . . ." While González testified that by "obstacles," he was referring to his upcoming move to Virginia, Irizarry's response demonstrated a different belief:

> [O]n the issue of custody, there is no obstacle if you are referring to the police thing, we decided to leave that there not continue and if you are referring to the federal thing, I already said what I knew I have nothing more to do [with it], I already

        [4]    Throughout Irizarry's and Alvira's testimony, the witnesses explained that the meeting in which Irizarry told Alvira that she did not want to testify in the Postal Service case occurred on May 24, 2022.  However, during one question on direct examination, Irizarry seemed to agree that the meeting occurred on January 20, 2022.  The district court concluded that, given Irizarry's repeated testimony, the meeting, in fact, occurred on May 24, 2022.  González raises no objection to this determination.

> indicated it to the social worker all that's
> left is for us to agree and that's it.

alteration in original). Irizarry thus understood González's "obstacles" comment to mean that, to facilitate a custody agreement, she should refuse to participate in his case against the Postal Service and withdraw her sexual abuse complaint against him. During later video calls with his son, González sought further opportunities to tell Irizarry not to testify and asked her about her interactions with counsel for the Postal Service. González claimed that it was Irizarry who would interrupt these video calls to tell him she did not plan to testify. Irizarry neither reported nor recorded these calls.

In June 2022, Irizarry received several contacts from the Postal Service's counsel. She stated that she did not respond to them because she was afraid that testifying against González would adversely affect her custody case.

On June 27, 2022, Irizarry received a subpoena to testify. That same day, Alvira interviewed González, who spoke to her about his pending federal case. According to Alvira's notes, González told her that "if an agreement is reached with the mother, it will be through the attorney and in writing." Critically, he added that the agreement must include that "the mother will not be a witness at the federal court and in the sexual abuse case."

González "mentioned that he wanted those two points to be very clear."

Throughout June 2022, González remained "very interested in knowing whether or not [Irizarry] was going to come to testify." Irizarry demurred, telling González that she was not sure if she would testify. Irizarry was particularly concerned because her son was visiting Puerto Rico at the time, and she feared that "González would not return him to [her]." Eventually, Irizarry contacted counsel for the Postal Service and informed them that González had told her that she was not obligated to testify. González denied making that statement.

In early July 2022, Alvira again met with González, who reiterated that "it must be established that the mother will not testify against him in the case in [f]ederal [c]ourt, and in the sexual abuse case." Alvira documented the meeting in her calendar and notes. González, however, denied making these comments. Soon after, on July 10, 2022, Irizarry sent Alvira an email notifying her that she intended to drop the sexual abuse allegations against González.

On July 19, 2022, the district court held a pretrial conference in the Postal Service case. Shortly after the conference, González learned that Irizarry would testify against him.

Irizarry called González later the same day to speak to her son. She began to record the call as soon as González asked if she was planning to come to Puerto Rico to testify. On the recorded portion of the call, González mentioned an "agreement" related to Irizarry's statement "to the social worker that [she] w[as]n't coming for the [f]ederal case, nor for the criminal case," which González acknowledged referred to the Puerto Rico sexual abuse investigation. Irizarry understood that González wanted her to refrain from testifying in his federal case and withdraw the criminal case involving her daughter. Irizarry replied that she had planned to call the prosecutor and that the criminal case was "done."

González then asked again about his federal case against the Postal Service, and Irizarry maintained that she had told Alvira that she was not interested in testifying. After referencing their custody agreement, González inquired why he had just heard from his attorney that Postal Service lawyers claimed that she would testify next week. He asked again if Irizarry was going to refuse to testify because "they were going to put that as part of the deal." Finally, González inquired about the subpoena Irizarry received, asking if she was "required to come."

Irizarry testified that she believed González was trying to manipulate and intimidate her during the call, implying that her testimony "was going to carry consequences for [her] custody

- 15 -

case." She explained that she felt extorted, fearful, and threatened and that she knew González did not want her to testify. Irizarry informed the Postal Service's attorneys about the call the following day.

Two days later, González was scheduled to return their son to Irizarry in Virginia. Irizarry met González at the airport, which González argued showed that she was not intimidated by him. However, Irizarry arrived with her older son and asked the teenager to record the interaction as a precaution. Later that afternoon, González called Alvira, reporting that he was not going to reach an agreement with Irizarry because -- referring to the July 19th phone call -- "she had laid a trap for him [by] record[ing] him."

Based on these facts, the district court found by clear and convincing evidence that González had "engaged in witness tampering, or at a minimum . . . attempt[ed] to do so . . . ." The court determined that González broached the topic of Irizarry's testimony during the July 19, 2022, phone call, that he conditioned the resolution of the custody case on Irizarry's decision not to testify against him, and that Irizarry's testimony would be damaging to González's case. Accordingly, the court concluded that González had committed a fraud on the court warranting dismissal of his case.

González challenges the district court's conclusion by providing a litany of facts that he claims the district court

unfairly weighed or ignored.  His objections generally fall into two categories.  First, he highlights facts that he claims show Irizarry's dishonesty.  Second, he argues that the court neglected to address certain pieces of evidence and, as a result, drew incorrect inferences.  We address these arguments in turn.

"[A] credibility determination is clearly erroneous only when it is based on testimony that was inherently implausible, internally inconsistent, or critically impeached."  Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998).  Such determinations should be treated with deference, see DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991), because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said," Anderson, 470 U.S. at 575.

Here, González argues that the district court erred in finding by clear and convincing evidence that he tampered with Irizarry.  He supports this contention with assertions that Irizarry never informed anyone that she was being intimidated before July 19, 2022; had a calm tone during the July 19 phone call; and was willing to meet González at the airport on July 21, 2022.  However, Irizarry provided plausible explanations for each of these facts.  As she explained in her testimony, she did not report feeling threatened because she did not want to derail custody negotiations and ultimately made a series of reports as

- 17 -

soon as she regained physical custody of her son. She also indicated that her phone call demeanor, which included a laugh, was caused by nervousness and relief. And while she did meet González at the airport, she also brought along her older son and asked him to record the interaction. Because we cannot say any of these explanations are implausible on the record before us, the district court did not clearly err in crediting them.

González also claims that, in crediting Irizarry's testimony, the district court overlooked impeachment evidence. For example, he avers that Irizarry lied to both him and Alvira about testifying, that she made material omissions when requesting a protective order in Virginia, that her past fine for providing false information to the Insurance Commissioner should carry more weight, and that she demonstrated mendacity on the July 19 phone call. The court nonetheless found Irizarry's testimony to be credible, explaining that her testimony was consistent with Alvira's, who had no apparent motivation to lie and maintained contemporaneous notes of pertinent conversations. "Where, as here, the judicial officer who saw and heard the witness makes a[] . . . credibility determination and supports that determination with specific findings, an appellate court should treat that determination with great respect." Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004). Accordingly, we find no clear error in the court's conclusion that Irizarry was not critically impeached,

especially when we consider that González's own testimony was largely self-serving and largely contradicted by Alvira, the one non-partisan witness.  See Ferrara v. United States, 456 F.3d 278, 287-88 (1st Cir. 2006) (affirming credibility determination).

Finally, González challenges certain inferences and conclusions drawn by the district court.  For example, González argues that the term "obstacles" in the May 26, 2022, WhatsApp message refers to Irizarry's failure to produce her terms in writing for a custody agreement.  That contention, however, is belied by González's own testimony that "obstacles" referred to Irizarry's move to Virginia.  González also contends he did not "backpedal[]" when he denied asking Irizarry to put in writing her assurance that she would not testify against him, that he was not the one who first suggested that Irizarry decline to testify, and that the court should have mentioned that he wanted to reconcile with Irizarry.  But even if we accepted each of these contentions -- which we do not -- the record still adequately supports the court's factual findings.[5]

---

[5]    Despite González's insistence, the district court was not required to make findings on every piece of evidence it received.  In civil cases, the court must only make "brief, definite, pertinent findings and conclusions upon the contested matters."  Supermercados Econo, Inc., 375 F.3d at 3 (quoting In re Rare Coin Galleries of Am., Inc., 862 F.2d 896, 900 (1st Cir. 1988)).

- 19 -

"[A] party challenging a trial court's factual findings faces a steep uphill climb," Ferrara, 456 F.3d at 287, because we will disturb a factual finding only if we have a "definite and firm conviction" that the finding is incorrect, Rivera-Rivera v. United States, 844 F.3d 367, 373 (1st Cir. 2016). González has not met that standard here.

The critical facts were identified by the district court and remain uncontroverted and unchallenged on appeal. Irizarry's testimony would have harmed, if not doomed, González's case against the Postal Service. Accordingly, he moved several times to preclude her testimony. The two had a contentious ongoing custody dispute, and González had told Alvira that he would be willing to resolve the dispute only if Irizarry declined to testify against him in the Postal Service case and dropped the sexual abuse case. Finally, the May 26, 2022, WhatsApp message and July 19, 2022, recording are consistent with the conclusion that González did not want Irizarry to testify and was conditioning a joint custody agreement on her cooperation. Based on these facts, the district court reached a reasonable conclusion that there was clear and convincing evidence showing that González improperly attempted to dissuade Irrizary from testifying in the Postal Service case.

## III.

We turn now to the sanction. The district court concluded that González's conduct constituted a fraud on the court,

which was a necessary predicate for the court to dismiss the case as the appropriate sanction. See Aoude v. Mobil Oil Corp. (Aoude II), 892 F.2d 1115, 1119 (1st Cir. 1989). González contends that the court incorrectly treated his conduct as a fraud on the court. Because the court's fraud-on-the-court determination involved both conclusions of law and findings of fact, it presents a "[m]ixed question[] . . . [that] 'invok[es] a sliding standard of review . . . .'" In re IDC Clambakes, Inc., 727 F.3d 58, 64 (1st Cir. 2013) (last alteration in original) (quoting Braunstein v. McCabe, 571 F.3d 108, 124 (1st Cir. 2009)). A more fact-intensive challenge, as this one is, warrants more deferential review. See id.

In this circuit, it is "elementary" that a "district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." Aoude II, 892 F.2d at 1118. Such a fraud "occurs where . . . a party has . . . set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Id. Committing a fraud on the court requires more than presenting "[i]naccurate assertions in lawsuits," Torres v. Bella Vista Hospital, Inc., 914 F.3d 15, 19 (1st Cir. 2019), or "perjury alone." George P. Reintjes Co., Inc.

- 21 -

v. Riley Stoker Corp., 71 F.3d 44, 49 (1st Cir. 1995). Rather, it occurs when a party intentionally prevents the court from knowing all the facts required to make an appropriate decision on a pending matter. See Pearson v. First NH Mortg. Corp., 200 F.3d 30, 37 (1st Cir. 1999); see also Torres, 914 F.3d at 19 (noting fraud on the court seriously affects the integrity of the tribunal and prevents courts from performing their usual functions). As noted above, a fraud on the court must be demonstrated by clear and convincing evidence. See Aoude II, 892 F.2d at 1118.

As the district court recognized, there is persuasive authority that witness tampering constitutes a particularly egregious kind of fraud on the court. See Ramirez v. T&H Lemont, Inc., 845 F.3d 772, 782 (7th Cir. 2016) ("[W]itness tampering is among the most grave abuses of the judicial process . . . ."); Ty Inc. v. Softbelly's , Inc., 517 F.3d 494, 498 (7th Cir. 2008) ("Trying improperly to influence a witness is fraud on the court . . . ." (emphasis added)); see also Erickson v. Newmar Corp., 87 F.3d 298, 304 (9th Cir. 1996) (suggesting witness tampering is unethical behavior that subverts the entire judicial process). Indeed, because tampering affects a witness's testimony, it invariably limits or distorts the facts presented to the court and thus affects the court's ability to perform its truth-seeking function.

At issue, then, is whether González's attempt to condition resolution of a custody dispute on Irizarry's decision to testify adds up to the kind of witness tampering that constitutes a fraud on the court. The district court properly concluded that it does. Although "fraud on the court can take many forms," convincing a witness not to testify, or to testify falsely, is the kind of corrupt action that squarely falls in this category. See Aoude II, 892 F.2d at 1118 (holding that appending fabricated purchase agreement to complaint constituted fraud on the court); Hull v. Mun. of San Juan, 356 F.3d 98, 102 (1st Cir. 2004) (bribery of a judge and deliberate lies during discovery constitute fraud on the court). Although González may not have physically threatened or intimidated Irizarry, he held over her head the proverbial sword of denying her custody of her child if she testified. That is precisely the kind of unconscionable scheme intended to deny the court material information and pervert the course of justice. We thus affirm the district court's conclusion that González engaged in a fraud on the court.

## IV.

Having affirmed the district court's fraud-on-the—court determination, we turn finally to whether the court's choice of sanction was appropriate under the circumstances. "Not surprisingly, the district court's judgment is reviewed with considerable deference." Starski v. Kirzhnev, 682 F.3d 51, 55

(1st Cir. 2012).  Our review is for abuse of discretion only. Aoude II, 892 F.2d at 1117.

When a party commits a fraud on the court, "the district court may fashion an appropriate pre-trial remedy to cure the effect of any misconduct."  Fernandez, 963 F.2d at 462.  That authority includes ordering the terminal sanctions of dismissal or default.  Aoude II, 892 F.2d at 1119; see Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991) (stating that although "dismissal of a lawsuit . . . is a particularly severe sanction," it is nevertheless a remedy "within the court's discretion").  Before ordering dismissal or default, a court must thoughtfully consider all the factors in a particular case and determine that the "misconduct is [sufficiently] egregious" to warrant such a serious sanction.  Aoude II, 892 F.2d at 1118.  Part of that evaluation requires the court to consider "lesser remedies" before imposing "the harshest sanction" of dismissal.  Hull, 356 F.3d at 103.

González claims that the district court abused its discretion by refusing to impose lesser sanctions such as permitting Irizarry and Alvira to testify about the tampering, providing corrective jury instructions, or issuing a protective order.[6]  We disagree.  The court thoroughly considered multiple

---

[6]    The district judge also contemplated lesser sanctions such as dismissing González's emotional damages claim or imposing a fine.  González does not press these options on appeal, so we do not address them.

alternate sanctions but concluded that dismissal was necessary. Although the court contemplated allowing Irizarry and Alvira to testify, perhaps coupled with an adverse jury instruction, it reasonably determined that such testimony would create an unwieldy trial-within-a-trial. In particular, it concluded that the testimony about the tampering would necessarily require references to the accusations of sexual assault levied against González, which inevitably would have become an improper focus of the trial.

González also resists the district judge's conclusion that a protective order would not have been a workable solution, asserting that he would have complied with any such order. However, González does not engage with a critical aspect of the district court's reasoning: a protective order would be inappropriate because it would not impose any punishment on him for attempting to tamper with a witness.

The district court here performed the appropriate kind of "careful study" of González's conduct and culpability before acting. See Hull, 356 F.3d at 103. It not only assessed possible alternate sanctions but also weighed González's dissembling during the evidentiary hearing, the persistence of his efforts to dissuade Irizarry from testifying, his callousness in leveraging the custody of a child to do so, and the importance of Irizarry's testimony to the case. See Aoude II, 892 F.2d at 1120-22 (noting litigant's "brazen conduct" warranted severe sanction); Hull, 356

F.3d at 102 (holding "deliberate" and "unconscionable" discovery scheme merited dismissal). In addition, González's actions, if successful, would have subverted judicial proceedings, not only in the Postal Service case, but also in the custody case and in the sexual abuse investigation. Such witness tampering "warrants a substantial sanction." Ramirez, 845 F.3d at 782. We accordingly conclude that, in these egregious circumstances, the district court acted within its discretion by dismissing González's case against the Postal Service.

## V.

For the reasons stated, we **affirm** judgment in favor of the Postal Service.